## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case Nos. 20-CR-240 (TJK)** |
| **SHAHID RANDOLPH,** | **22-CR-163 (TJK)** |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Defendant Shahid Randolph is before the Court to be sentenced for his unlawful possession of a firearm and ammunition on two occasions—first in October 2020 and then again in May 2022. He possessed both guns while on supervised release for a 2020 federal felon-in-possession conviction, which he in turn had committed while on supervised release for a 2012 Superior Court carjacking conviction. And he possessed the 2022 gun after he convinced the government and the Court to go along with temporary medical release—only to cut off his ankle monitor and become a loss of contact for five months. For his entire adult life, the defendant has engaged in repeated criminal conduct involving the use and possession of firearms. His conduct demands punishment.

For reasons that follow, the United States respectfully requests that the Court sentence the defendant to a term of imprisonment at the top of the applicable guideline range—which the government puts at **51 months**—to be followed by three years' supervised release. In support of its recommendation, the government respectfully submits this Memorandum in Aid of Sentencing.

### I.   FACTUAL BACKGROUND

The factual proffer to which the defendant agreed as part of his August 4, 2022, guilty plea (20-CR-240, ECF No. 47; 22-CR-163, ECF No. 10) establishes the following facts:

**20-CR-240**

On October 21, 2022, at approximately 9:20 p.m., at 1953 19th Place SE, in Washington D.C., Metropolitan Police Department (MPD) officers were on patrol by foot when Officer Jeskie noticed an idling gray Dodge Stratus.  The windows of the vehicle were heavily tinted.  Officer Jeskie approached the vehicle from the rear and illuminated the window of the front passenger door.  He immediately observed Defendant Shahid Randolph, who was sitting in the passenger seat of the Dodge Stratus, tuck his elbows into his body and cover his waistband and lap with his arms. Officer Jeskie observed a lit marijuana cigarette in Mr. Randolph's right hand that he nearly dropped in the attempt to cover his lap.  Officer Jeskie opened the passenger door and immediately could see that there was a silver metal object partially hidden underneath Mr. Randolph's arms which Officer Jeskie, based on his training and experience, knew to be a firearm.  Officers carefully lifted Mr. Randolph's arms and observed a silver and black handgun.

Officer Jeskie voiced the predetermined code word for the presence of a firearm.  The firearm was recovered from between the legs of Mr. Randolph.  The firearm was discovered to be a silver and black Ruger SR40c .40 Caliber pistol.  The serial number on the firearm was "343-22078."  A check of the serial number affixed to the firearm revealed that it was reported stolen on November 2, 2015, by York Area Regional Police Department.

Defendant Randolph was previously convicted of Unarmed Carjacking in the Superior Court for the District of Columbia, docket number 2012 CF3 015717,[1] and sentenced to seven (7) years of incarceration.  As a result of that sentence, Defendant Randolph would have known he had been convicted of a crime punishable by more than one year of imprisonment.

---

[1] The docketed statement of offense contains a scrivener's error with respect to the case number of the defendant's D.C. Superior Court carjacking conviction; the criminal case number is **2012** CF3 015717, not 2013 CF3 015717.  Although it is not material, the government regrets the error.

There are no firearms or ammunition manufacturers in the District of Columbia; therefore, the firearm and ammunition in this case would have traveled in interstate commerce.

Finally, on or about January 5, 2022, Mr. Randolph willfully failed to appear for a judicial proceeding – specifically, a status hearing held in the instant case (20-CR-240) – after the Court had released Mr. Randolph on his personal recognizance on or about July 30, 2021, to obtain medical care. During the time Mr. Randolph was a loss of contact in 20-CR-240, he engaged in additional criminal conduct culminating in an arrest on or about May 1, 2022, in 22-CR-163.

## 22-CR-163

On May 1, 2022, at approximately 8:15 p.m., in front of 831 Yuma St SE, in Washington D.C., MPD officers were patrolling in an unmarked vehicle when they observed Defendant Randolph standing beside the front passenger door of a double-parked vehicle. Upon noticing police approaching in an unmarked police cruiser, Mr. Randolph stepped towards an unidentified female and pulled her against his front waistband area. Through officers' training, knowledge, and experience, they knew this is a common tactic used to conceal firearms being hidden in the front waistband area. Officers began to exit their vehicle to make contact with Mr. Randolph.

Mr. Randolph immediately grasped his front waistband area and ran towards a wooden fence beside the sidewalk, jumped onto the fence, and climbed over it. Officer Readmond immediately located a black in color handgun on the other side of the fence that Mr. Randolph had been observed climbing over. Mr. Randolph continued running down the hill which eventually exited onto the 800 block of Barnaby St SE, where he was stopped and arrested.

The firearm was a Taurus G2C 9mm handgun, with the serial number, "TLN21336." A check of the serial number revealed that it was reported stolen on July 22, 2019, by the Cumberland County Sheriff Office in Fayetteville, NC. DNA analysis conducted on the firearm by the FBI

concluded that it is 61 octillion times more likely if Mr. Randolph and three unknown, unrelated people are contributors to the DNA recovered from the firearm than if four unknown, unrelated people are contributors.

Defendant Randolph was previously convicted of Unarmed Carjacking in the Superior Court for the District of Columbia, docket number 2012 CF3 015717, and sentenced to seven (7) years of incarceration.  As a result of that sentence, Defendant Randolph would have known he had been convicted of a crime punishable by more than one year of imprisonment.

There are no firearms or ammunition manufacturers in the District of Columbia; therefore, the firearm and ammunition in this case would have traveled in interstate commerce.

## II.   PROCEDURAL HISTORY

### The 2019 Case:  19-CR-209 (TSC)

On June 18, 2019, Metropolitan Police Department officers arrested the defendant for possessing a Glock 19 firearm and approximately 1.42 grams of cocaine base in the 1400 block of Morris Road SE, in Washington, D.C.  The defendant was prohibited from possessing a firearm due to his conviction for carjacking in the D.C. Superior Court, case number 2012 CF3 015717, for which he had been sentenced to a mandatory minimum term of seven (7) years' imprisonment. On June 19, 2019, the government charged the defendant by complaint, and Anthony Martin, Esq., was appointed to represent him.  On June 21, 2019, a federal grand jury returned an indictment charging the defendant with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1), and one count of Simple Possession of a Controlled Substance, in violation of 21 U.S.C. § 844(a).  At the detention hearing on June 24, 2019, the defendant consented to detention.   The case was assigned to the Honorable Tanya S. Chutkan.

On July 12, 2019, the defendant pleaded guilty to one count of violating 18 U.S.C. § 922(g)(1) pursuant to a negotiated plea agreement under which the government agreed to recommend a sentence 25 percent below the applicable guideline range.  Sentencing was scheduled for October 3, 2019.  On August 19, 2019, Mr. Martin moved to withdraw, citing the defendant's dissatisfaction with his performance.  On August 26, 2019, Judge Chutkan granted the motion and appointed Joseph Caleb, Esq.  The sentencing was later converted to a status hearing and continued.  At a subsequent status hearing on November 5, 2019, Judge Chutkan granted the defendant's request for a third lawyer and set a continued status hearing for November 14, 2019, which the docket indicates was to address the "defendant's request to withdraw [his] plea."  At the November 14, 2019, status hearing, the Court appointed Thomas Abbenante, Esq.  The defendant ultimately did not move to withdraw his plea, and on March 9, 2020, was sentenced to a term of 22 months' imprisonment to be followed by 36 months' supervised release.

In May 2020, the defendant moved for compassionate release due to the COVID-19 pandemic, which the government opposed.  Judge Chutkan granted the motion on May 22, 2020, and resentenced the defendant to time served to be followed by 36 months' supervised release.

Probation filed a violation petition following the defendant's October 2020 arrest (charged in 20-CR-240) and alleged additional violations following his June 2022 arrest (charged in 22-CR-163).  A hearing on the alleged violations has been trailing the two cases before this Court, and it is currently scheduled for October 2, 2023.

### The 2020 and 2022 Cases:  20-CR-240 and 22-CR-163

On October 21, 2020, MPD officers arrested the defendant for possessing a Ruger SR40c firearm in the parking lot of 1953 19th Place SE, in Washington, D.C.  On October 22, 2020, the government charged the defendant by complaint, and David Bos, Esq., was appointed to represent

him.  The government's motion for pretrial detention was granted over defense objection.  On October 29, 2020, a federal grand jury returned an indictment charging the defendant with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).  The case—20-CR-240—was assigned to this Court.

On July 29, 2021, the defendant filed an unopposed motion for temporary release from custody so that he could seek medical treatment.  This Court granted the motion the next day, ordering that the defendant was to be released into the High Intensity Supervision Program and to remain on home confinement at his mother's residence.  On November 3, 2021, Probation filed a petition alleging, *inter alia*, that the defendant left his mother's residence without permission on at least ten different dates.  The same day, Mr. Bos moved to withdraw, citing the defendant's dissatisfaction with his performance.  On November 5, 2021, this Court granted the motion, and Allen Orenberg, Esq., noticed his appearance on November 15, 2021.

On December 17, 2021, this Court held a videoconference status hearing concerning the defendant's conditions of release and scheduled an in-person hearing for January 5, 2022.  On December 28, 2021, Probation petitioned for an arrest warrant, alleging that, on December 27, 2021, the defendant cut off his GPS monitoring device and fled his residence.  After the defendant failed to appear for the January 5, 2022, status hearing, this Court revoked his release conditions and issued a bench warrant.

On May 1, 2022, MPD officers arrested the defendant for possessing a Taurus G2c firearm in the 800 block of Yuma Street SE, in Washington, D.C.  On May 10, 2022, a federal grand jury returned an indictment charging the defendant with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of Crime Punishable by Imprisonment for a Term

Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).  The case—22-CR-163—was assigned to this Court pursuant to Local Rule 40.5(c)(1).

On June 29, 2022, the parties filed a joint status report, stating that the defendant had rejected the government's global plea offer and wished to proceed to trial in case number 20-CR-240 beginning on November 7, 2022, with the trial in case number 22-CR-163 to be scheduled after the first trial.  On July 13, 2022, the Court issued a scheduling order and set the November 7, 2022, trial date.

The defendant then decided to accept the government's global plea offer.  On July 22, 2022, the Court scheduled a videoconference change of plea hearing for August 4, 2022.

### *The August 4, 2022, Guilty Plea Hearing*

On August 4, 2022, the defendant pleaded guilty to two counts of violating 18 U.S.C. § 922(g)(1)—one in case number 20-CR-240 and one in case number 22-CR-163.  Under the plea agreement, the government agreed to proceed to sentencing in both cases on the same day.  (As discussed below, the practical effect of this agreement is that both counts group under the guidelines and thus yield the same guideline range as if the defendant were convicted of only one count.)  The government agreed to recommend a sentence within the guideline range as determined by the Court.  It also agreed to cap its sentencing recommendation in the revocation matter at the bottom of the applicable guideline range.

### *The Defendant's Subsequent Endeavor to Withdraw His Guilty Plea*

On September 30, 2022, the Metropolitan Police Department held a press conference and announced an internal affairs investigation into multiple members of the Seventh District Crime Suppression Team, and on October 27, 2022, the government disclosed two related MPD Internal Affairs Presentment Investigative Reports to Mr. Orenberg.  Neither the investigation nor the

Presentment Investigative Reports, which are dated October 5 and 6, 2022, existed at the time of the defendant's guilty plea.  The government disclosed the reports in an excess of caution because they reference officers involved in both 20-CR-240 and 22-CR-163.

A week after the government's disclosures, Mr. Orenberg moved to withdraw as counsel, citing the defendant's dissatisfaction with his performance.  At a hearing on November 15, 2022, the Court granted the motion.  On November 19, 2022, Barry Coburn, Esq.—the defendant's third and current attorney—noticed his appearance.

The defendant ultimately filed a motion to withdraw his guilty plea on March 13, 2023, which the government opposed.  After the motion was fully briefed, the Court heard oral argument on May 19, 2023.  On June 28, 2023, this Court denied the motion.

### ***Current Procedural Posture***

Sentencing is currently scheduled for September 26, 2023, at 10:00 a.m.  The parties' sentencing memoranda are due on Tuesday, September 19, 2023.  Accordingly, the government now timely submits this Memorandum in Aid of Sentencing.

## III.   LEGAL STANDARD

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018).  The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors.  *Gall v. United States*, 552 U.S. 38, 49–50 (2007).  The Guidelines' recommended sentencing range will

ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."

*Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>>> (i) issued by the Sentencing Commission . . .; and
>>> (ii) that, . . . are in effect on the date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement –
>> (A) issued by the Sentencing Commission . . . and
>> (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

## IV.   SENTENCING GUIDELINES CALCULATION

For reasons that follow, the government respectfully submits that the applicable guidelines

range is **41 to 51 months'** imprisonment.

**A. The Defendant's Total Offense Level is 18.**

The guidelines for the sole count of 18 U.S.C. § 922(g)(1) in both cases group under USSG §3D1.2(d). The applicable guideline is USSG §2K2.1.

The parties agree that the Base Offense Level is 14 under USSG §2K2.1(a)(6)(A) because, as discussed above, the defendant was a prohibited person at the time he committed the instant offenses. Two (2) levels are added because the firearms were reported stolen. USSG §2K2.1(b)(4)(A). An additional two (2) levels are added because the defendant, by his admitted, willful failure to appear for a January 5, 2022, status hearing in 20-CR-240, obstructed or impeded the administration of justice with respect to this prosecution. USSG §3C1.1.[2] Under the plea agreement, the defendant reserved the right to contest the application of the obstruction

---

[2] Probation takes the position that three (3) levels should be added under USSG §3C1.3 because the defendant committed the offense conduct in 22-CR-163 while on release in 20-CR-240. In its response to the Draft Presentence Investigation Report (20-CR-240, ECF No. 66; 202-CR-163, ECF No. 13), the government expressed its belief that, out of an abundance of caution, probation should apply the two-level adjustment under USSG §3C1.1, as referenced in the plea agreement, not the three-level adjustment under USSG §3C1.3. The government explained that the Commentary to §3C1.3 indicates that the enhancement applies "after appropriate sentencing notice." It does not appear that the D.C. Circuit has addressed the question of what constitutes "appropriate sentencing notice." The government previously indicated that it intended to seek the two-level adjustment under USSG §3C1.1 and did not provide notice of its intention to seek a three-level adjustment under §3C1.3. The government recognized, however, that some courts have found that inclusion of the adjustment in the PSR with an opportunity for the defendant to object constitutes sufficient notice. *See, e.g.*, *United States v. Browning*, 61 F.3d 752, 757 (10th Cir. 1995). In the Final Presentence Investigation Report (20-CR-240, ECF No. 69; 22-CR-163, ECF No. 34), filed earlier today, Probation has noted the government's response for the record but maintains that the Court should apply the three-level adjustment under §3C1.3. The government asks this Court to apply the two-level enhancement under §3C1.1 as contemplated by its plea agreement. If the Court should agree with Probation and apply the three-level enhancement instead, the defendant's total offense level will be 19, resulting in a guidelines range of 46 to 57 months' imprisonment, and the government will request a sentence of 57 months' imprisonment at the time of sentencing. (The government agreed to seek a sentence within the applicable guideline range as determined by the Court and is seeking a sentence at the top of that range.)

enhancement.

Finally, for two reasons, the Court should deny adjustment for acceptance of responsibility under USSG §§3E1.1(a), (b):  first, because the defendant willfully cut off his ankle monitor, failed to appear for the January 5, 2022, hearing, and was a loss of contact until he was arrested months later with yet another illegal firearm; and second, because the defendant pursued a baseless, unsuccessful attempt to withdraw his guilty plea, during which he contradicted his earlier sworn admissions and falsely denied his guilt.

With respect to the defendant's failure to appear, as the government noted in the plea agreement, Application Note 4 of the Commentary to USSG §3E1.1 provides:

> Conduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.  There may, however, be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 apply.

In affirming the application of §3C1.1 for a defendant's willful failure to appear in court, the D.C. Circuit has held that such conduct is "directly and inherently obstructive," explaining that it "is inherently obstructive because a rational person would expect such conduct to obstruct justice." *United States v. Reeves*, 586 F.3d 20, 23–24 (D.C. Cir. 2009).  In *Reeves*, the defendant failed to appear at his arraignment and was a loss of contact for eleven months; the D.C Circuit held that "his conduct impeded the administration of justice by making it impossible for the government to prosecute him until the authorities expended the time and resources necessary to re-arrest him." *Id.* at 24.  Although the district court also applied the two-level adjustment for acceptance of responsibility in *Reeves*, this case is distinguishable because (i) the government consented to the adjustment for acceptance of responsibility in *Reeves*, which it does not do here; and (ii) Reeves was rearrested on a bench warrant, not for engaging in the same exact criminal conduct.  Given that the defendant absconded while on release in 20-CR-240 and returned to court

approximately five months later, only after being arrested for engaging in the same criminal conduct for which he was on pretrial release (not to mention supervised release), this is not the "extraordinary" case in which both adjustments should apply.

The defendant's subsequent, frivolous endeavor to withdraw his guilty plea—during which he contradicted his sworn admission of guilt and falsely asserted his innocence in the vaguest possible terms—provides yet another basis for the Court to deny the adjustment for acceptance of responsibility. *See, e.g.*, *United States v. Berkeley*, 567 F.3d 703, 711 (D.C. Cir. 2009) (holding that the district court "was more than justified in denying an offense-level reduction for acceptance of responsibility" where the defendant unsuccessfully attempted to withdraw his guilty plea based on an alleged entrapment offense that the district court found to be untruthful); Application Note 3 of the Commentary to USSG §3E1.1 (entry of a plea of guilty provides evidence of acceptance of responsibility that "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility").

The Total Offense Level is thus **18**.

**B. The Defendant's Criminal History Category is IV, and His Guidelines Range Is Thus 41 to 51 Months' Imprisonment.**

The government concurs with Probation's assessment of the defendant's criminal history as set forth in the Final PSR on pages 10 through 16.  With seven (7) criminal history points, the Criminal History Category is IV.[3]  A Total Offense Level of 18 and a Criminal History Category

---

[3] The defendant's criminal history score is five (5) before the addition of two (2) "status points" under current USSG §4A1.1(d).  The Sentencing Commission has adopted an amendment, scheduled to take effect on November 1, 2023, that would eliminate "status points" as they currently exist; the Commission has also voted to make the amendment retroactive.  Under proposed §4A1.1(e), a defendant will now receive only one (1) status point—but only if he has seven (7) criminal history points.  Because the defendant has 5 criminal history points, he would not receive the additional status point under §4A1.1(e), bringing his Criminal History Category to III after the amendment.  While the amendments will likely go into effect on November 1, 2023, the Commission voted to delay retroactive implementation for defendants sentenced before

of IV results in a guidelines range of **41 to 51 months'** imprisonment.

**THE GOVERNMENT'S SENTENCING RECOMMENDATION**

As stated above, the government respectfully requests that the Court sentence the defendant to a term of imprisonment at the high end of the guidelines range—which the government puts at **51 months' imprisonment**—to be followed by three years' supervised release.

**A. Nature and Circumstances of the Offense**

The nature and circumstances of these offenses is serious and warrants a sentence at the top of the applicable guidelines range. As a threshold matter, the defendant's possession of two loaded guns—one while on pretrial release for the other, and both on supervised release for his 2020 felon-in-possession conviction—were inherently dangerous acts that placed the community (and the defendant himself) at serious risk. *See, e.g.*, *United States v. Gassaway*, No. 21-CR-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public); *United States v. Howard*, No. 20-MJ-181 (BAH), 2020 WL 5642288, at *2–3 (D.D.C. Sept. 21, 2020) (making same observation); *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence"). While these cases do not involve the defendant's known use of the recovered firearms, people carry guns because they intend to use them.

Unlawful gun possession is so problematic—particularly by someone who has previously committed a violent crime involving the use of a firearm—because the District has seen an explosion in the number of armed, violent offenses: between September 19, 2020, and September 19, 2023, violent crimes committed with a gun went up by 2,651 compared to the previous three

---

November 1, 2023, by three months. This delay means that while defendants sentenced before November 1, 2023, may apply for a sentence reduction prior, a court may not reduce a defendant's sentence before February 1, 2024.

years.  *Crime Cards*, Metro. Police Dep't,  https://crimecards.dc.gov/all:violent%20crimes/ with%20a%20gun/3:years/citywide:heat (last visited Sept. 19, 2023).  Similarly, the homicide rate has skyrocketed in recent years.  *See* Peter Hermann, *Homicides are falling in many big cities. In D.C., they're rising.*, Wash. Post (August 19, 2023, 9:00 a.m.), https://www.washingtonpost.com/ dc-md-va/2023/08/19/dc-homicides-rising-major-cities/ ("But more than halfway through this year, killings in the District are surging toward numbers not seen in two decades . . . .").  Indeed, the past two years have seen the highest homicide rates since 2003:  In 2022, there were 203 homicides, and in 2021, 226 homicides.  *District Crime Data at a Glance: 2023 Year-to-Date Crime Comparison*, Metro. Police Dep't, https://mpdc.dc.gov/page/district-crime-data-glance (last visited Sept 19, 2023).  There have already been at least 192 homicides in 2023, a 30% increase from this time last year.  *Id.*  That number has been constantly increasing and will be even higher by the time of the sentencing hearing.  By comparison, in 2012, there were 88 homicides.  *Id.*

While, as far as we know, the defendant was apprehended before he was able to use the firearms against another, unlawful possession can lead to dangerous consequences, thereby underscoring the need to take such crimes seriously.  This is especially true where, as here, the defendant has previously committed a violent crime involving a firearm.  The defendant's conduct is also concerning because he has repeatedly possessed firearms while under supervision, showing a blatant disregard for the law and the authority of this Court.  As this Court is well aware, the defendant possessed the gun in 22-CR-163 while in bench warrant status for the gun in 20-CR-240, and both while on supervised release in 19-CR-209.  This is what then–Chief Judge Howell recently described as "the trifecta of circumstances" in assessing dangerousness:  "unlawful possession of a loaded firearm, criminal history of a violent crime conviction involving a firearm, and instant offense conduct occurring while on supervision or probation."  *United States v.*

*Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *11 (D.D.C. Feb. 6, 2023).

A substantial prison sentence at the top of the applicable guidelines range is warranted.

**B.  The History and Characteristics of the Defendant**

The defendant has a long and violent criminal history.  His criminal history score underrepresents the danger he poses to the community because it does not account for his juvenile adjudications.  And his adult convictions are extremely concerning.  In 2012, the defendant was convicted of carjacking in Superior Court case number 2012 CF3 015717; while the defendant pleaded guilty to the "unarmed" offense, the facts of the case involved the defendant and a co-defendant (who was armed with a gun) carjacking a woman at gunpoint as she carried groceries into her home.  The defendant served the seven (7) year mandatory minimum sentence and was released from prison in November 2018.  This significant term of imprisonment was evidently not sufficient to deter the defendant from unlawfully possessing a firearm, as he was arrested in June 2019—approximately seven (7) months into his term of supervised release.  As a result, the defendant was subsequently convicted of felon in possession in 19-CR-209 and sentenced in March 2020 to a term of 22 months' imprisonment to be followed by 36 months' supervised release; less than two months later, Judge Chutkan commuted his sentence to time served, over the government's objection, in view of the COVID-19 pandemic.  The defendant began another term of supervised release, and again, within months, unlawfully possessed a firearm, giving rise to 20-CR-240.  The defendant convinced the government and Court to go along with home confinement due to his medical condition, only for the defendant to cut off his ankle monitor and become a loss of contact for five months.  He was brought back before this Court not of his own volition but because he was arrested with yet another firearm, giving rise to 22-CR-163.

While the government is sympathetic to the defendant's serious medical condition, it

mitigates neither his culpability nor his dangerousness.  The reality is that the defendant has engaged in repeated, unrepentant criminal conduct for his entire adult life.  And he has sought to obstruct and impede the proceedings in these cases—not only by seeking temporary medical release, absconding from pretrial supervision, and then reoffending in the same way—but by serially firing competent defense attorneys and then pursuing a frivolous plea withdrawal motion.

### C. The Need for the Sentence Imposed

The defendant has shown that nothing will deter him from illegally possessing firearms. He has repeatedly and brazenly defied the law and the authority of this Court.  A significant prison term is necessary both to punish the defendant and to protect the community by incapacitating him.

### <u>CONCLUSION</u>

For the foregoing reasons, the government respectfully recommends that the Court sentence Defendant Shahid Randolph to a sentence at the top of the applicable guidelines range to be followed by three years of supervised release.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

Dated: September 19, 2023   By:   */s/ Paul V. Courtney*
Paul V. Courtney
D.C. Bar No. 1034252 / N.Y. Bar No. 5392337
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
601 D Street NW
Washington, D.C. 20530
(202) 252-1719
paul.courtney@usdoj.gov